Good morning, Your Honors. I'm Gary Finn for the petitioner Lina Juarez-Mendez. And I want to start by addressing the 28-J letter that was submitted by opposing counsel, citing Covarrubias v. Gonzales. I think that that Covarrubias case is clearly distinguishable from my case and, in fact, strengthens the argument of my client in this matter, because in Covarrubias, the petitioner had knowledge of how his brother, his undocumented alien brother, was going to enter the United States, where, when. The petitioner in Covarrubias was not present at the scene of the illegal entry and doesn't have to be. We can see that the person doesn't have to be present at the scene of an illegal entry. But in this case, not only was my client not present at the scene of an illegal entry or an attempted illegal entry into the United States, he had no knowledge of how that illegal entry was to take place. He didn't know when these people that he was allegedly assisting were going to enter the United States. In fact, in this case, there was never even an attempted illegal entry. The people that my client was allegedly assisting never even tried to enter the country. I can't, I don't think that the government can cite a single case where a person has been found to be aiding and abetting an illegal entry when there hasn't even been an attempt. In this case, there was not even an attempt. And I believe that in order for a person to be liable under the alien smuggling statute, he has to, he or she has to at least know something about the plan to enter the country. In this case, all my client did was take care of the children of the people, these two people that were going to attempt to enter the United States illegally. He had no knowledge of how they were going to attempt to do this. Did he know they were planning to come to the United States illegally? He knew they were planning to come to the United States. What difference does it make if he didn't know the exact means by which they were going to do that, as long as he knew he was playing a part in this plan? Well, for all my client knew, these folks might have attempted to get a visitor's visa. They might have gone to the, he didn't know if they were going to try to come over the border illegally. Well, that's what I just asked you. Did he know that they were going to try to come illegally? And I thought you said yes. If he's coming, if they're going to come legally, then it's a different case. No. He knew that they were going to go to Palm Springs. They were in Mexicali just across the border in Mexico. My client knew that they were going to be going to Palm Springs to pick up the children. This is, we can see that. But he never discussed with them how they were going to come across the border. They might have tried to get a visitor's visa to come across legally for all my client knew. He wasn't involved in the planning of this. Well, they didn't know how they were going to go across. Pardon me? They didn't know how they were going to go across. They hadn't decided that yet, right? At that moment, they themselves might not have even known. But they knew they were going to come. I think, though, just to carry the conversation a bit further, one might, I think it might be a fair inference from the record that they're going to cross illegally just because they asked him to pose as a godfather. You know, it's hard to, I mean, from this record, that's a fair inference. And if that's so, then isn't it enough to render him inadmissible if he aided a scheme which he thought was going to be illegal? Well, I don't think so, Your Honor, because, first of all, an attempt was never even made. Does that make a difference? I think it does. I mean, if there's a thwarted, if the, my guess is the government's view is it was a thwarted attempt because they intercepted the kids at the border, detained them, and the parents came. If you thwart an attempt or stop it before the attempt, does it make any difference for the purposes of the statute? Well, I think if you read the statute literally, it says that a person is liable for inalienable if they aid and abet an entry or an attempted entry. And in this case, there was neither. There was neither an entry or an attempted entry. It may have been thwarted in the government's view, but my client's participation was so de minimis in this that he can't, I don't think he can be held liable under the statute. Plus, he didn't, in his mind, he didn't have what we might say the mens rea of an alien smuggler. This fellow has no criminal record in the United States. His wife is a U.S. citizen. He has three children that are U.S. citizens. In his mind, he was just going to take care of these children. I don't think that he really directly participated in an active plan to enter the country illegally. Let me ask you a hypothetical question. Suppose these people actually did present themselves at the border or sneak under a fence or something like that. Would he then, same, otherwise the facts are the same, would he then be aiding and abetting alien smuggling by taking the kids? Perhaps if he knew, if he had participated in planning that illegal entry. The parents, I mean, same facts. Parents, they take the kids so that they don't have to see us at the border, you know. But only in my hypothetical, they actually come across illegally. Well, I think if my client knew how they were going to come across, if he participated directly in any of the planning, then I think, yes, Your Honor, he would be liable in that instance. But those aren't the facts here. He didn't know. My client didn't know exactly how the people were going to cross. He didn't participate in any of the planning. He never even encouraged them. He never offered them. What I'm trying to get at is if your argument is that this effort to come to the United States never ripened into an attempt. It was merely preparation and not, didn't develop into a full-fledged technical attempt. If that's your argument, tell me. Well, that's one of my arguments, Your Honor. And the other argument is that my client didn't participate in the planning, even if the attempt had been successful. I don't believe that my client would be liable. He didn't participate in the planning. He didn't know exactly how they were going to come across. And these folks were living in Indiana. They were coming from Mexico. And, you know, somehow they were going to be getting across the border. My client didn't really participate in helping them. He has to be actively involved in the commission of the crime. In the case of Altamirano v. Gonzalez, which this court was citing the criminal alien smuggling statute, and said that a defendant cannot be convicted of aiding and abetting absent an affirmative act of assistance in the commission of the crime. And I don't think that my client was actively involved in the commission of any crime. I think we have your argument. And do you want to reserve some time for rebuttal? I wanted to also mention the issue of the government lodging charges at the end of the hearing. Yes, certainly. And I think Judge Weisslein has a question. Okay. I'll reserve my position. No, no, no. Go ahead and address your issue now, and then I think Judge Weisslein wants to ask a question. Okay. Your Honors, I think it was unfair and not in accordance with the regulations at ACFR 1003.30 that the government lodged additional charges in this case at the end of the removal proceedings after all the evidence was in. This regulation does provide for the lodging of additional charges, but the regulation says during the proceedings. In this case, the government lodged the additional charges at the end of the proceedings. All the evidence was in. The government, in this case, really brought incorrect charges and then used the provision allowing the lodging of charges to correct the mistake. I represented the petitioner at the removal proceeding, and it was really impossible for us to prepare a defense because we were not on notice of the true charges that were going to be coming and that did come at the end of the hearing. There was an opportunity to negotiate a different type of a resolution of the case with government counsel at that time that would not have resulted in my client's removal. There's a practice that sometimes goes on in immigration court where the government, in these smuggling cases, where the government may agree to take the smuggling charge away and lodge a fraud charge, and there's a waiver for the fraud charge that my client would have been eligible for. Under the smuggling charge, since my client didn't have five years in the country as a lawful permanent resident yet at the time of the hearing, he wasn't eligible for any relief. If we had been on notice of these charges that were going to be coming, which were that my client aided and abetted the illegal entry of the parents as opposed to the children, we could have proceeded in a very different manner. So we were very highly prejudiced by the government not bringing the charges of aiding and abetting the parents at the beginning, and the outcome in the case would have been different. So I'll reserve the balance of my time. Roberts. So you had plenty of time, though, didn't you, to respond to the new charges? It was months before the matter was resolved, if I recall correctly. Oh, yes. But what happened was the government attempted at the beginning of the proceedings, the government attempted to lodge the fraud charges that I mentioned. And the immigration judge said, no, you can't do that, because he didn't see that a fraud charge was appropriate. But as it turned out, it would have been appropriate, and there could have been a very different disposition of the case. But why couldn't that have occurred in the interim after they lodged the charges and the matter was continued? Because after the government, at least according to the IJ, after the government had proved the illegal entry charges, the aiding and abetting illegal entry charges, then they were not willing to withdraw those charges and place the new charges, which would have been the fraud charges, at the end of the proceedings. They were willing to do it at the beginning. Well, let me get the ‑‑ I may have the sequence incorrect. You tried the case on the initial notice to appear, and then at the end of the evidence, basically, at that proceeding, the government wants to amend, file a new notice to appear, right? The new charges, yes, Your Honor. New charges. And then you were given, there were some months in the interim, and then there was a hearing on the new charges. Yes, there was. And there was, I agree, there was plenty of opportunity to respond to the new charges. We had a whole second hearing on the new charges. There was plenty of opportunity to respond. But the opportunity that we had to negotiate a different resolution of the case with the government was lost. And it was lost because the charges of fraud were rejected by the I.H.A. at the very beginning of the case. That's kind of more like settlement negotiations, though, isn't it? I'm sorry, Your Honor? Do we get involved in settlement negotiations? It sounds like you're talking about the settlement policy. Well, I guess what I'm trying to say, Your Honor, is I'm trying to point out the prejudice that we suffered because the government didn't bring the charges of aiding and abetting the parents at the beginning of the proceeding. The government, from the very beginning, had all the evidence in the case. They knew exactly what had happened. But they came in and charged that the children were undocumented aliens. Right. The children had Indian birth certificates. There's no question the children were illegal. No, they were born in Indiana. There's no question at all. But the government, by bringing those charges, we missed other opportunities that we might have had to have resolved the case differently. I'm just trying to point out the prejudice. I understand. I understand your point. Okay. You characterized your client as more or less a babysitter of these children, just taking care of the children is the way you described it. My concern, at least at that point, is he seems to be far more than that. I mean, he had to actually drive across the border to get the children after involving himself in this fraudulent transfer order and pick the children up at midnight and then snuck back, tried to sneak back across, lied to the border agents. It seems to be far more than just a child care event. It seems that's at least the facts that indicate that. I agree, Your Honor. My client did a very stupid thing. And he would be the first, if he was here, he would be the first to admit that. He did a very stupid thing. But I don't think it rises to the level under the precedent of the law to alien smuggling. May you clarify one thing for me on the record? It may or may not make any difference. The questioning of the parents, how do you pronounce their names? It's Ocelot and Lopez. Okay. Ocelot, it appeared that the judge just called them up. Is that right? They appeared by telephone. They were back in Indiana. Right. But, I mean, did you anticipate that they were going to be called? Yeah, we agreed to that. We agreed to allowing them to be called and having them testify by telephone. Of course, at that point you weren't defending against the charge that they were, your client was illegally assisting them, just the kids. Well, no, at that point we were defending against the charge that they were illegally assisting. No, you're right, Your Honor. I'm sorry. At that point we were defending against the charge that the children were illegal aliens. I guess my question is if you'd known that they were going to charge your client with assisting the parents, would you have engaged in a different questioning of the parents? Totally different. And, you know, my client could have taken the Fifth Amendment and refused to testify completely. If we had known that the charges were going to be that my client was aiding and abetting the parents, we would have prepared the case very, very differently. Yeah. Okay. Thank you very much for your argument. Our questions have taken over time, but we'll give you a couple minutes for rebuttal. Thank you very much, Your Honor. All right. We'll hear from the government. Good morning. May it please the Court. Manuel Palau for the Attorney General in this case. This Court has acknowledged that Congress intended the alien smuggling provision to cover a broad range of conduct, from encouragement to actually transporting an alien illegally across the border. All the statute requires is that the alien knowingly and affirmatively assist another alien to try to enter the U.S. illegally. Here we have knowledge, and we also have affirmative conduct. We have knowledge by Mr. Juarez Mendez that the parents of the children at issue were undocumented aliens who intended to enter the U.S. Counsel suggests that they may have wanted to enter legally, but if they could do so, they certainly wouldn't need him to transport the children separately from them. If they could enter legally, they could also bring their kids in with them legally because they were U.S. students. We do have knowledge that the... Counsel, this is Judge Thomas. Let me interrupt you for a second. It's an unusual case because I don't find anywhere in the record where they had a plan yet on how they were going to get to the United States. Is that true? I think that's correct. The details of their actual entry were not yet formulated, but the plan, I would submit, is twofold. The plan, as testified to by the alien parents here, was, number one, to have somebody transport their children into the U.S. ahead of them. Once they knew they were there safely, then they would embark on their own effort to enter the U.S. illegally, not hindered by their children. Well, they said, how are you going to cross? And they said, we didn't know. Yes, Your Honor. But I submit that all he has to know, all Mr. Warren Mendez has to know, was that they planned to enter the U.S. illegally. Right, but they didn't tell him that. I mean, I understand, I think, where you're going with your argument, which is, inferentially, he probably should have known. But he says they didn't tell him, they say they didn't tell him, and they say they didn't have a plan. Is that the state of the record? What the record indicates, Your Honor, is that he knew, actually, that they were undocumented, they had no right to enter the U.S. legally. And, number two, the record is also clear. They told him they planned to travel to California as soon as possible to meet their children once they were transported there by somebody. That somebody was Mr. Warren Mendez. So the record does not show that they had the details of their own entry in place, but I would submit the plan is the two-part plan of getting the children across the border first, then they would make their way across the border by whatever means became available to them. And the only means that were available to them had to be illegal because they had no legal basis to enter the U.S. So that's the plan. They could have gone on a, as Counsel points out, they could have gone on a travel visa and taken their chances like that. I think it's perhaps a fair inference from the record that they were going to go illegally, but I just don't see any place in the record where they told him that they were going to go illegally. He just said, we're going to take the kids over and we're going to come over later. He didn't say legal or illegal or whatever. That's correct, Your Honor. I mean, it just makes it a more difficult case. I think that's a fact that was found by the immigration judge. And I think that this Court does not, I mean, I know the factual record is one thing, the questions of law are another, but here there's a fact finding by the immigration judge. And what the Court is pointing out is an alternative fact finding to come up with. And the mere fact that you have two possible factual inferences that could have been made from the record evidence does not mean that the immigration judge's finding is not supportable. Right, but under our case law we have a case where you've got a passenger who knows that there is an illegal alien in the trunk, and we said that's not enough, which seems to be a stronger case to me than this one. Your Honor, that issue is the degree to any affirmative action, affirmative conduct by the accused smuggler. That's not mens rea or knowledge. No, I understand that. I mean, it didn't help them necessarily get over the border by taking the kids, and in fact it never occurred, they never tried to go over the border. I would disagree with that, Your Honor. I think that they made it clear to Mr. Juarez-Mendez that the reason they wanted him to take the children across the border separately was to spare them the rigors of an illegal border crossing. There were no details given, I agree with that. But again, if they were going to enter legally, there's not one single reason they would hand their two children over to a complete stranger to transport them several hours back into California on their behalf. There simply makes no sense whatsoever. Well, except that they were citizens of Indiana, and so they were born in Indiana. So if they've got citizen kids, it's a reasonable inference at the border that the undocumented parents are living in the United States if they go on a visitor's visa, there's less chance, less risk that's going to be discovered, I would assume. Well, again, I would have respectfully stated that what we're doing here is an exercise in other possible findings that the record evidence could support, and that's not enough to conclude that the hijack decision was not based on substantial evidence. Judge Silverman has a question. Counsel Judge Silverman has a question. Good morning, Mr. Block. Yes, sir. We've heard a number of times mentions of a visitor's visa. Was there any testimony that these people were going to try to get a visitor's visa? No, sir. My next question is I'm a little concerned about where an attempt begins and preparation, which doesn't rise to an attempt, ends. I mean, these people had some plan. There doesn't seem to be any doubt about that. But I'm concerned about whether it had ripened into an attempt or it was still in the preparation stage, which doesn't constitute an attempt. I'm thinking of, you know, cases like I found a bank robbery case where the crooks drive to the bank and are sitting outside but then decide not to go into the bank, and, you know, that ruled not an attempt. It was mere preparation. At what point, you know, at what point did this become something other than preparation? Your Honor, I think the plan clearly began. The plan, as hatched by the two alien parents, their plan was we don't want to cross the border with our young children, so we're going to have someone, protruded by our uncle, take them across for us first. Then we are free to execute Plan Part 2, which is us crossing the border into the U.S. So the plan was a two-part plan, and the condition present to their plan was the safe passage of their children into the U.S. by someone other than them because they couldn't do it due to their undocumented status. So the attempt began, Your Honor, when I would submit liberally it began the moment he began to drive to Mexico to pick up the kids. More literally, it began when he picked up the kids from the parents and took them to the border crossing point to get them into the U.S. because that was the condition present. Once that part of the plan failed... How does that differ from going to the bank? I mean, all of what he did involved legal activity. He could legally go into Mexico. He could legally come back to the United States as an LPR. The citizen children were legally entitled to go back to the United States. There's no crime in any of that, nor is there a crime in driving to a bank, even though your intent is to rob it. So how is it different? Your Honor, what I would state is that, as the court noted in Clover Rubio's... I'm sorry, that's your case. The court states that alien smuggling statute does not describe acts that are static or instantaneous occurrences. Rather, these are acts that occur over a period of time and distance and don't occur at one particular moment or location. So this was... And the statute does not require that the act be illegal or illicit. If you look at the simple act of transporting two U.S. citizen children from Mexico to the U.S., that's not illegal. It's not illicit. But that's not all that happened here. That was done for one reason and one reason only, and that was to facilitate the parents' illegal entry into the U.S. If the parents wanted the children to visit their relatives in the U.S. and did not plan to enter themselves, then I think we don't have much of a case here. But here they told Mr. Juarez-Mendez, please take our kids into the U.S. so we can enter ourselves. We are undocumented. So I think it's very substantial. We support a two-part plan here. And you cannot look at the mere act of taking two U.S. citizens into the U.S. as the plan. That's not the plan. That's just taking kids across the border who are allowed to be in the U.S. The plan is two-part. Bring the children first into the U.S. first. Then we will be free, unhindered by two young children who are two years of age or younger to cross over illegally. Let's assume it happened in a reverse context. He goes down and babysits the kids while they say, we're going to go across the border first. It's too complicated. We're not going to tell you whether we do it legally or illegally. But he agrees to watch the kids until they get a phone call to bring them to the United States. Under your theory, even babysitting in Mexico is still aiding and abetting. That's a closer call, Your Honor. I think it could be under the statute. That's obviously not what we have here. But I think the only distinction in that case, Your Honor, is the degree of affirmative conduct to me. Because in one case, well, actually, they're the same. I mean, whether he drives into Mexico, picks them up and brings them back, that's one circumstance that's affirmative action. In the second one, he comes to Mexico from the U.S. for the only reason of helping these two parents. He babysits the kids for a few hours. Actually, I take it back. I think it's a stronger case. Well, in some senses, yes, because there's illegal conduct. The other thing about this case, and we're asking it because these are difficult issues, but you have totally legal conduct that's alleged to be in assistance of illegal conduct that never occurred. And that's kind of out there in the vapor, in a sense. Well, again, Your Honor, the response to that is that the attempt began once he came and tried to get the children across the border to the U.S. Because, as the court stated in Covarrubias, these are not specific isolated occurrences. They cover a broad range. There was no other reason for Mr. Warsman, as a complete stranger, to pick up two young children and bring them to the U.S. What he was told the reason he was doing that for, by the parents, was to help us get to the U.S. It was made clear to him, by the illegal aliens here, that they had a too far plan to enter. As I stated before, the attempt began once he tried to get the children into the U.S. And a statute of its own terms does not require illicit or illegal conduct. It's just that if anyone who offers to help... I was just going to ask you that. Suppose these people, or suppose this petitioner here, Mr. Juarez Mendez, did the completely legal act of burying some clothing, a change of clothing, and some money just across the border so that when these people cross illegally they could have a change of clothes and some cash. That's completely legal, but that would be aiding and abetting, wouldn't it? Absolutely. And you can give money to an alien in another country, money to be used to pay for alien smuggling or assistance to come across, and that's assisting. I mean, if that's an easy one, in this case, there's the Moran case, the Sanchez case, the Corazoni case. Paying for an alien smuggler or giving money to someone to allow them to pay an alien smuggler is assisting and aiding in the Smuggling Act. But if nobody ever comes across the border, is it still aiding and assisting? Yes, it is. I mean, if you're saying, I'm sorry, if you're just, you don't know why you're burying the clothes and nobody ever comes across, it's a different case perhaps. Well, these are all interesting. There's no knowledge there. There's no knowledge there. Counsel. Knowingly. Yeah. I'm sorry. No, I hate to interrupt you here, but our time is getting short. I did want to ask you about the change in the notice to appear. I take, I understand your argument for your brief, but it is, I must confess, a little bit unfair to change the rules at the end of the hearing when you haven't proven your case and most of the evidence is locked in. Your Honor, the regulation is what controls here, and 1003.30 says you can change, you can add additional charges, amend charges any time during the proceedings for any, I'm not sure if it says for any reason, but you can do it at any time before the hearing, and there was no, originally, my understanding of what happened here is that at the end of the hearing in 2003, DHS thought, I'm sorry, INS back then, thought to amend the charge based on the evidence presented at the hearing. The immigration judge did not allow that. Right. He asked the parties to brief that issue, and while that was pending, DHS thought, issued a new charge based on new evidence, and that, as Judge Feistlein points out, he had nine months to prepare and respond to those new charges. There was no prejudice here to the extent he could have negotiated some arrangement that could have happened before the second hearing. Perhaps, but I think my point is that the evidence had already been locked in, and just speaking as a trial attorney, if somebody changes the rules in midstream on me and I've already cross-examined a witness or had a witness on, it's a, you know, you would see. Your Honor, I have to make, I'm very sorry, I have to make clear that the evidence was not locked in. Well, sir, the parents had already testified. He'd already made the decision to testify himself. He didn't have to testify. I mean, all those decisions are made tactically in any suit by the attorney who's facing the charges. And I'm not, I understand your regulatory argument. I'm just saying it's not. I didn't hear what you said about why it was or was not locked in. What was your answer to Judge Thomas' question? Because it was a separate hearing, Your Honor, in 2004 where he had, where in fact Mr. Juarez and his wife testified in 2004 after the new charges and had a full opportunity to put on any new evidence they wanted to in regard to the new charge. Right. That's what I meant. Yeah, no, I understood that, and I think we're talking the same language. They had certainly a full opportunity at the new hearing, but whatever had happened at the other hearing under the other theory was locked in. I'm just, that's, I mean, I can appreciate counsel being upset. Whether or not it's permitted under the regulations is a matter, I think, probably of construction rather than fairness. So I suppose, Your Honor. Go ahead. Just briefly, he still has, even assuming that that's maximum fairness, he still has to demonstrate prejudice to make out a due process violation. He's shown no prejudice here, and the fact is he could have negotiated whatever he wanted to between the two hearings before the immigration judge made his final point. Yeah. Judge Beisling, do you have any questions? No, I just, I'll comment that, you know, I think we're finding ourselves in a position of having to draw a line, especially where the parents' attempted entry began. And that's what I spent half the night last night thinking about. You know, when they first thought about the plan, that wasn't it. When they first talked about the plan, that wasn't it. And then they proceeded down the road. At some point, did this parent's efforts become an attempted entry? And I wondered, well, maybe it was when they took their two young children, babies, and handed them in the dark of the night to a stranger to take them across the border. Maybe that was it. Maybe it wasn't. Those are the issues that I'm wrestling with. I think that's a good characterization. I would only say that the plan was put into motion when Mr. Juarez Mendez appeared in Mexico and took custody of those children. Thank you, counsel. And we'll give you, Mr. Fenn, two minutes for rebuttal. Thank you, Your Honors. If you look at the record, it is 88-92-93. At the hearing on July 8, 2003, government counsel was arguing with the I.J., Mrs. Robinson, for quite a while, trying to allow the I.J. to let her lodge a fraud charge. The I.J. refused. I never objected. The I.J. refused because, at the time, the pending allegations were that the children were illegal aliens. This is where the unfairness is, pages 88-93. If government counsel had been allowed to lodge the fraud charge, the alien smuggling charges would have been withdrawn, and my client would have been eligible for a waiver based on his equities in the United States, which are outstanding. That's where the prejudice and that's where the mistake and the unfairness is right there. But it was the judge that prohibited that. The judge refused to allow the lodging of the fraud charge because the judge's reasoning was, how could there be any fraud if these children are U.S. citizens? They have a right to enter the United States. I mean, it's hard to fault the I.J. for rejecting a theory that appeared to be untenable. Well, I'm not faulting the I.J. I'm faulting the government for bringing an incorrect charge. And then after this whole thing went down, then at the end of the hearing, they come back with the additional charges. At that point, if the fraud charge had been allowed to come in, then we would have been able to get relief from my client. After that, it's not possible anymore because he didn't have the time necessary for cancellation and removal, the time in the United States. Okay. You know, this is a ñ I know this is a difficult case because at some point, you know, regarding the smuggling allegations, the court has to draw a line someplace. You know, like I said in my brief, what if I ñ and Judge Thomas, you brought up this example too. What if I am in Mexico and I know somebody's going to go to the United States illegally and I just buy them a meal or buy them some shoes or something so they can come through the desert maybe? I mean, is that enough? I don't think even government counsel would do that. Well, that's why I asked, where does preparation end and an attempt begins? It sounds like they're talking around the kitchen table. That's preparation. Here they actually send their children ahead. You know, that's the argument that they started the plan in motion. They went beyond just talk. They took affirmative steps to get the kids into the United States so they could meet up when they cross the border. Well, I think that's true, Your Honor, but I think what the court has to do is look at the language of the statute. There has to be participation in the entry itself. The alien charged with smuggling has to know the plan. How are they going to get across the border? They have to know more than my client knew in this case. These folks, Ocelot and Lopez, they might have gone to get a tourist visa. A lot of people do that. A lot of people, and I have a lot of experience with this, if they're going to come into the United States illegally, they may have to ñ or even legally with a visitor's visa. If they're going to come in legally with a visitor's visa, a lot of times they have to get somebody else to bring the U.S. citizen. I don't know where this tourist visa thing comes from. I looked at the transcript. I didn't see tourist visa anywhere in here. Is that something you're arguing, or is that in evidence in any way, shape, or form? It's not in evidence at all how they were going to come across. The immigration judge found that my client should have known that the people were undocumented, but the immigration judge found that my client had no knowledge of exactly how they were going to come across the border. Thank you. And there has to be more than that, Your Honors, for the court to find a smuggling. I think you have your argument in hand. Any further questions? All right. Thank you both for your arguments. Thank you very much. Thank you, Your Honor. And we will allow you to disconnect from the telephone. I appreciate your getting up and appearing. Thanks. I appreciate it, Your Honor. The next case on the oral argument calendar is Arisco v. Bank of America. You should note that Omni Home Financing, which was scheduled for oral argument, has settled. We'll proceed with Arisco.
judges: Beistline, Thomas, Silverman